Good morning, ladies and gentlemen. Judge Barrett is unable to be here in person today, but will be participating by speakerphone. Speakerphones sometimes have problems with lag and with two-way communications, so if you hear something, you might want to stop and wait to hear from Judge Barrett, or I may suggest that you stop. I'm sure we can work through this. The first case for argument this morning is Medical Mutual of Ohio v. AbbVie. Ms. Dorsey. Good morning, Your Honor. May it please the Court, Katherine Hancock Dorsey on behalf of Plaintiff Appellant Medical Mutual of Ohio. The summary judgment record here shows that defendants specifically targeted Medical Mutual and its pharmacy benefits manager, Medco, and later Express Scripts, with marketing materials that their topical TRT, testosterone replacement therapy drugs, were safe and effective not just for treating the FDA-approved use of the drugs, which was for primary and secondary hypogonadism, but also for treating the symptoms and conditions loosely associated with low testosterone levels. The purpose of those marketing materials to MMO was to induce them to retain those drugs on its formulary without restrictions. That scheme worked. Because of those representations to MMO and its pharmacy benefits manager, they believed that the drugs were safe and effective for those uses and, in fact, believed that there were no cardiovascular risks, and it maintained those drugs on its formulary without restriction, resulting in MMO's payment of prescriptions that it would have otherwise not paid for had it known about the cardiovascular risks. That's certainly a statement of your position. But the district court found that there was no evidence that any misrepresentation was material to Medical Mutual's decision. Unless you persuade us that that's wrong, just restating the position you began this litigation with doesn't really cut it. Of course, Your Honor. And I think there were several key errors in the district's court decision where it did not find that there was reliance, and I would like to go through those key errors and what we believe to be the best evidence that there was reliance here. Unfortunately, the best evidence may not be enough. Anyway, go ahead. Well, I'll focus on the district court's errors, and then I can go through the evidence to try and convince Your Honor. The district court's analysis was fundamentally flawed here where it focused just on prior decisions, prior authorization decisions, and prior decisions about the formulary focusing on the TRT drugs. Those prior decisions, both I think he cited, the court cited the 2004 Medco prior authorization, a 2008 one prior authorization, and again in 2012 where MMO did not adopt a prior authorization for these TRT drugs. But focusing on those past decisions, none of those involved evidence of safety risks, including the cardiovascular risks about those TRT drugs. So focusing on those, there was nothing showing the cardiovascular risks, which here made a distinct difference. When MMO found out about those cardiovascular risks after the FDA's safety investigation announced in 2014, MMO adopted a prior authorization. It then knew that those drugs were not safe and effective and posed potential cardiovascular risks, and because of that significant safety concern, MMO then adopted a prior authorization. The district court also, in addition to its analysis being focused just on those prior distinct authorizations, which were different on the facts, the district court ignored whether MMO relied on the concealment of the cardiovascular risks. The court only looked at the pharmacy benefits manager reliance on the cardiovascular risks. I think you would help the court more if you used fewer initialisms. Okay, understood Your Honor. Can you respond better to English words? Fair enough, Your Honor. The district court ignored whether Medical Mutual relied on the concealment of cardiovascular risks. It looked only at Express Scripts and Medco's reliance on the cardiovascular risks, and that was at A42 of its opinion in the appendix. And so the district court failed to realize that MMO's prior utilization manager… It's very hard, isn't it? It is. Once you get started down that road, I'm sure Yoda has a phrase for that. Yes. Once you start down that road forever, it will rule your destiny. Yes, Your Honor. I will try. The district court failed to recognize that the prior utilization management decisions did not involve the concealment of safety risks, which was at issue here. And Medical Mutual could not have been expected to discuss safety risks of which it was not aware. If it had no evidence that there were safety risks or that there were concerns about the safety and effectiveness of these drugs, it naturally wouldn't have had a conversation about those in deciding whether to adopt a utilization management. It's not surprising that there would be no direct evidence that they would have discussed on the record if they didn't know about such risks. Didn't they hear from a lot of other people or places? Not just one source. I got the impression that the judge was going through and went through it very meticulously, but it wasn't just one, I didn't want to call it a target or whatever. It just seemed that they were getting information from a lot of places before labeling. They did. The pharmacy committee, the committee that decided these utilization management decisions at Medical Mutual, the evidence in the record is that they considered a lot of information, but part of the information they considered was defendants' information about their drugs. There was evidence in the record that Medical Mutual said they relied on that, at least in part, on defendants' statements about the safety and efficacy, which the district court acknowledged in its opinion at page 827. But there was also information in the record that the clinical information was Medical Mutual's making utilization management decisions, and that was in a number of deposition testimonies, that Medical Mutual always considered the clinical information first, including defendants' information. And the district court did not even acknowledge that evidence in its opinion. I don't understand everything about a formulary, about things that are sort of accumulated in there. Isn't that how they have it? Is that a formulary, the approved drugs? They have a formulary, which is put together by their pharmacy benefits manager, Express Scripts in this case. So they put that together. But then Medical Mutual is the one who decides whether any restrictions are appropriate on that formulary, such as utilization management limitations or step therapies. So here we're not challenging that the drugs were put on the formulary, that there was reliance to put them on the formula, rather that Medical Mutual kept them on the formulary without restrictions. They did what? Attach them, you say? What was the verb used in relation to the formula that Medical Mutual did? I don't understand. I want to be sure and clear how they come up with the formulary. So the formulary is that the pharmacy benefits manager reviews much information. They have pharmacists and doctors. They review articles, clinical information, information from the manufacturers. They take all that information, and they decide what drugs should be placed on the formulary. And the evidence in this record is that Medical Mutual adopted the formularies wholesale from its pharmacy benefits manager from Express Scripts. So it just adopted the formulary. But then Medical Mutual makes its own decision about whether to place limitations on those drugs. Decision on the what? Sorry, utilization management. Utilization. Utilization management limitation, which is just a phrase that describes all sorts of restrictions and limitations that Medical Mutual could put on a drug that's already on its formulary. Instead of taking a drug off its formulary, for instance, here the testosterone replacement therapy drugs had an approved use for treating primary and secondary hypogonadism. And so even if they were being promoted and used for other conditions that were not FDA approved, Medical Mutual would not have taken those drugs off its formulary because they had those approved uses that were important for its patients. But what they would have done had they known about the risks earlier was to put a restriction on its formula, which they did here, that required a prior authorization. So a doctor, if a doctor prescribed the drug for you and you went to the pharmacy to get the TRT drug, then the pharmacy would not fill it. They'd have to go to the doctor and have the doctor fill out forms for this prior authorization to give the insurer information so that it may clear. What do they call it, off-label or something like that? Well, it's really, I mean doctors can prescribe for off-label uses, so it's not strictly off-label, but the prior authorization means the pharmacy and the doctor have to fill out some paperwork so that the drug is not being used for whatever condition the insurer says it can't be used for. So in this case, when Medical Mutual implemented the prior authorization, it stated in its prior authorization that the drug had to be used for primary and secondary hypogonadism, and that was it. And that also took into account the FDA's later label change for the testosterone replacement drugs, that they had to be used for primary and secondary hypogonadism, and that they were not approved for just age-related hypogonadism or symptoms just associated with low testosterone levels. Well, I get the age-related info. Excuse me, Your Honor? I know what age problems. Right, but it was, it couldn't just, the FDA clarified. Even judges get old. Yes, Your Honor. So going back to the points about what the district court's evaluation of the evidence here, the district court never considered whether MMO ignored, sorry, whether Medical Mutual relied on the concealment of the cardiovascular risk, which was critical here in Medical Mutual's decision to adopt its prior authorization. The district court also weighed the evidence, concluding that reliance on the 2014 step therapy was a, quote-unquote, stretch. Now, a step therapy is where Medical Mutual, in 2014, agreed to give preferred status to two of the drugs, Androgel and Axiron, and what that means is when it gives the drugs preferred status, it means that it knows more prescriptions of those drugs are going to be provided because you have to try those two testosterone replacement therapy drugs and fail on them before you could be prescribed another. And when it adopted that step therapy, it would not have done so allowing more prescriptions of those two drugs unless it knew that they or believed that they were safe and effective. So the fact that Medical Mutual preferred these two drugs, again, shows that Medical Mutual relied on representations that they were safe and effective. It would not have agreed to be giving out more of these drugs if it had known that there was a safety issue involved. Counsel, can I ask a question? Can everyone hear me? Yes. So you waited until July of 2016 for the topical TRTs, is that right? Yes, the prior authorization was adopted in July 2016. And that was two years after the FDA flagged potential issues with these, is that right? That's correct, Your Honor. So what explains the delay? If your categorization of these drugs was really due to the misrepresentations you had received from the defendants, once you were made aware that there was a potential problem, why did you take so long to change the categorization? Right. The delay can be explained, Your Honor, because once the FDA had kind of taken control of the situation and launched its own investigation, it made sense for FDA, which is the expert on these safety decisions, it made sense for Medical Mutual to wait to see what the FDA decided. But we know that Medical Mutual was relying and considering this The Medical Mutual's pharmacist, Dr. Joshi, remarked, Oh, the irony. We just recommended these two drugs for the step therapy program, which shows that Medical Mutual had been unaware of the safety risks here and they were surprised by the FDA's announcement. And then there's further evidence that Medical Mutual was keeping their eyes on what the FDA was doing then because Dr. Joshi then suggested in an email that they keep our eye on this. In other words, they were going to monitor what the FDA did. And she also then followed up with their pharmacy benefits manager, Express Scripts, to ask them if Medical Mutual had ever had a prior authorization in place for the topical testosterone replacement therapy drugs. So in essence, Your Honor, they waited until the FDA finished its investigation and made the label change, and then MMO acted, Medical Mutual acted to adopt its prior authorization. So I think there were the other, going back to, again, the district court's analysis here, the district court also discounted Dr. Candidate's testimony that Medical Mutual relies at least in part on info from the manufacturers in making these utilization management or prior authorization decisions. And the district court discounted that because Medical Mutual did not identify a specific decision it had made in reliance on that information. But again, the information here was that Medical Mutual did not know of the cardiovascular or other safety risks, and so in reliance on something it didn't know, it did not adopt a prior authorization earlier. And back to your question, Your Honor, Judge Mannion, about all the different information defendants relied on and considered, I mean, that Medical Mutual considered and relied on, there might be circumstances where Medical Mutual would have other evidence before its committee that might tip it off to a safety risk or other information so that it might not rely on defendants' representations about their drugs. But here there's nothing in the record that showed Medical Mutual had contrary information that would have tipped it off to know that defendants' representations about the drug, its safety, and efficacy were not true. And so from that we can see that from the record that Medical Mutual did rely on the information they were given. And the other thing is the district court, again, ignored the evidence that clinical safety was Medical Mutual's primary consideration in making utilization management decisions. The district court suggested that rebates were an issue, but again, the district court didn't even acknowledge the numerous testimony that was in the deposition testimony that was in the record about how safety always came first in these decisions about whether to adopt utilization management decisions. For those reasons, Your Honors, because the district court's analysis was flawed and didn't look at the adoption of the prior authorization, the step therapy, and the information about that safety always came first in these decisions, we think that the district court's decision was fundamentally flawed and that there should be a reverse of the grant of summary judgment. But one other thing I think we would point to, Your Honors, that shows causation here is that the prescriptions after the prior authorization was adopted, the prescriptions for these drugs dramatically decreased. And in fact, defendants themselves predicted that prescriptions would drop by up to as much as 90% if Medical Mutual had adopted a prior authorization. If the court has no further questions, I'll save the remainder of my time for rebuttal. Certainly, counsel. Mr. Cavanaugh. Good morning, Your Honors. William Cavanaugh on behalf of L.A.'s. The district court correctly concluded that no reasonable jury could find that any alleged misrepresentation by the defendants approximately caused the injury alleged here. Not a single Medical Mutual witness testified that they relied on any misrepresentation made by any of the manufacturer defendants in this case. Not a single Medical Mutual witness testified what they would have done differently if supposedly the material misrepresentation had not been made. I think it's important right at the outset to understand the case Medical Mutual's lawyers brought. It was not about cardiovascular risk. They alleged and sought that the injury was any off-label use of a testosterone replacement product for, quote, age-related. It wasn't about cardiovascular risk. They didn't bring a case on behalf of people who may have experienced a cardiovascular adverse event. So today, they focus on cardiovascular when their case was actually all about supposed age-related use. And the best indication of that is if the court goes to their prior authorization, which they put in place, it's at Docket 445, Exhibit 3-2, there's nothing about cardiovascular in there. Frankly, there's nothing about age-related prohibitions in there. All it requires for their prior authorization is a patient with symptoms consistent with hypergonadism, fatigue, loss of libido, other potential symptoms, and a blood test. Actually, two blood tests on two different days that shows that you have a testosterone level below 300 mg per deciliter. That's it. Nothing about cardiovascular, nothing about age-related. You just have to have symptoms and the blood test. So they haven't even taken any steps to adjust what they contend is the theory of their case. Now, they argue that this case is about their inaction, and the district court somehow misunderstood that. But we have repeated instances over the history of the allegations in this case where Medco, their pharmacy benefit manager, brought to them the issue of andropause, the use of testosterone drugs for supposed andropause, age-related hypergonadism. Medco brought that to them in 2004. As the district court found, no medical mutual declined to restrict use for andropause. So there's a specific example where the issue was put in front of them, and they chose not to take any action. 2008, Medco comes to them again and says, do you want to put a prior authorization in place as to testosterone products? They decide to only do it as to injectable products, not as to topical products, the products sold by the defendants in this case. 2012, Medco comes, now it's Express Scripts, their pharmacy benefit manager comes to them and says, we've been doing a review of your programs. You don't have a prior authorization for topical testosterone products. Medical mutual, again, silence. And as the district court correctly noted, they can't find a single instance in which in 2004, 2008, 2012, in which medical mutual's decision as to what to do about off-label use of testosterone, which is what the case they brought is about, where that decision-making, where that action or inaction was driven by any material misrepresentation made by any TRT defendant. Now, today they talk about the decision they made in 2014 to go with a step therapy, and that somehow that had something to do with some sort of safety evaluation. But to be clear, what a step therapy is, there were five testosterone replacement topical products. Because two of them, including my client, was willing to pay higher rebates, they became the preferred products. It's just, it isn't increasing the number of prescriptions for testosterone replacement products, it's just shifting what the market share is going to be among those virtually identical products. So it had nothing to do with safety or efficacy, it had to do with rebates, which of the testosterone manufacturers were going to get the largest sales within this class of drugs. So the step therapy had absolutely nothing to do with any safety or efficacy evaluation. Now, I would urge the court in looking through the record, the district court assumed for the sake of argument that misrepresentations had been made, but then found absolutely no evidence of any linkage between any sort of misrepresentation and a decision made by Medical Mutual or even their pharmacy benefit manager as to formulary status or a utilization technique, such as a prior authorization. Now, starting with formularies, the record is clear, and Medical Mutual doesn't dispute that Medical Mutual didn't make a formulary decision. That was made by the pharmacy benefit managers. And if you go back to 2000 and they put them on the formularies, at least as early as 2001, when our product, Androgel, came on the market, as the district court noted, there was no evidence whatsoever as to what Medco considered in putting that drug on the formulary. Medical Mutual would just ask for speculation. But as we note on page 42 of our brief, when we took a 30B6 deposition of the Medco representative, they testified they had no substantive information about the risk, safety, or efficacy of TRT medications that was communicated to it by any TRT manufacturer. And Medco did not know whether any information a defendant provided to it was considered in making formulary placement decisions. And finally, as we note on page 42, Medco made clear that they don't accept any information made by a manufacturer at face value without doing their own due diligence. That's why the Medical Mutuals of the world hire pharmacy benefit managers to make those type of evaluations. So that's the formulary piece. Medical Mutual had nothing to do with that. I assume they always look into whatever the manufacturer says in addition to a lot of other things. As they testified, they look at the whole pharmacy benefit manager looks at the entire clinical record here. And I would point out on the issue of this cardiovascular risk, which now seems to be driving the case, although it's not the case they brought, they brought an off-label case. The point is really that all the FDA said was that there was a possible risk. They have not in any way... Isn't that just what the word risk means? It's the difference between risk and certainty. Your Honor, I would say that adding the word possible qualifies it and to some degree diminishes it further. I think you might mean low risk. Fair. That's a fair point. But the FDA raised that as a possible risk. Nothing further has happened. There have been subsequent studies shown. TRTs are still out there. They're still being used. And their own, as I said earlier, I would urge the Court to go and look at their own prior authorization. In their prior authorization, they acknowledge that 20% of men over the age of 60 will have abnormally low testosterone levels and that over the age of 80 it rises to 50%. And then all their prior authorization requires is symptoms and a blood test. And the blood test is based on what the FDA told AbbVie and other TRT manufacturers to use in establishing hypergonadism, below 300 milligrams per deciliter. If the Court looks at the issue of... There is actually no evidence in this record of misrepresentations made directly to MMO. When you look at some of the documents that they cite, now as to Auxilium and Endo, no allegations whatsoever on appeal. As to Lilly, they cite their prior brief, but there's no underlying support for it. They cite a conversation that someone at Lilly had with Mr. Bogoyevich at Medical Mutual where he says nothing of substance was discussed and we primarily discussed insulin. Same thing with respect to AbbVie. They say, well, you wanted to show Medical Mutual your value proposition deck. What they don't show... And then they cite a redacted document at 435 Exhibit 22. We then unredacted the document because it had to do with other drugs, not in this case, and it makes clear the value proposition was about Umera, AbbVie's multibillion-dollar drug, which they lead every discussion with. And the witness from Medical Mutual, Mr. Borgia, testified, as we note in our thing, that he can't even recall if they ever had a meeting about this. And the meeting would have dealt with Umera. And what our witness said in his email was, and if we have time, can we talk about contracting for Androgel? We don't even know if that conversation ever took place. And according to Medical Mutual, they don't think it did. So when you go back and you look at the underlying, quote, evidence, it just isn't there. So the district court actually gave Medical Mutual a pass in assuming that at some point over the 14 years, some misrepresentation was made. But then it searched the record in a careful analysis over 44 pages. It could not find any linkage between some assumed misrepresentation and decision-making by Medical Mutual or their pharmacy benefit managers. As I said earlier, in 2004, the pharmacy benefit manager comes to them and raises the point of andropause, which could be age-related hypergonadism. Medical Mutual takes no action. They didn't seek to try to limit this alleged off-label use. Same thing in 2008. Same thing in 2012. So this is not a case where the plaintiff can say, well, yeah, we didn't take any action because we weren't aware of anything. We weren't aware of any issues. Their pharmacy benefit manager brought the issue of andropause to them. But even today, you can today, under their prior authorization, if you have symptoms and a blood test, they'll reimburse. It has nothing to do with cardiovascular effects. It has nothing to do with age-related hypergonadism. They actually know elderly men can suffer from hypergonadism. And to Judge Barrett's point earlier, let's remember they filed this case in November of 2014, a 434-page complaint by their lawyers saying that there was a massive fraud, widespread off-label use. Terrible, terrible thing. What did they then do? Nothing. Nothing for over two years. Why did they go to a prior authorization? Because we filed a second motion to dismiss, relying upon a Delaware case, that had thrown out one of these third-party payer cases brought by companies like Medical Mutual, where calculated inaction following a complaint is basically an admission that you were not materially misled in any respect. That's the first time, the first time you see them talking about, oh, we have to get a prior authorization in place. It's after the defendants raised it in a motion to dismiss. And then they're so worried about it, they don't realize for over a year that their pharmacy benefit manager hadn't even put it in place. It took a year for them to figure that out. And then they put the prior authorization in place. That has nothing to do, as I've talked about, has nothing to do with cardiovascular. It permits age-related... A physician can use it for age-related hypogonadism. We can't promote for that. But a prior authorization doesn't have anything to do with our promotion. It has to do with a doctor deciding to use the drug and Medical Mutual or their pharmacy benefit manager deciding whether they're going to reimburse for it. So it has to do with use. And there's nothing that prohibits that use today. If the court doesn't have any further questions, we'll rest on our brief. Thank you, counsel. Anything further, Ms. Dorsey? Your Honors, this is not a case about off-label use. Doctors are allowed to prescribe for off-label use, and in fact Medical Mutual has to pay for off-label use prescriptions. This is about the safety and efficacy, and that Medical Mutual was misled about the safety and efficacy and didn't put restrictions on its formulary because of that. Defendants talk about the prior authorization that Medical Mutual implemented, which is at Exhibit 53 of the Opposition for Summary Judgment. That prior authorization makes clear that it is for primary and secondary hypogodadism, and that also must be understood in light of the FDA's label change, which made clear that the drugs were not to be used for age-related hypogodadism and made clear that there was a cardiovascular risk. If the prior authorization really does nothing, as defendants contend, then it's curious that the prescriptions precipitously dropped after that prior authorization took effect. Opposing counsel notes the 2004 recommendation by Medco and noting the concerns about andropause. Well, the documents before Medical Mutual that were given to it at that time by Medco noted that there were also potential benefits of using these drugs in that class of men. Thank you, Ms. Dorsey. Thank you, Your Honor. The case will be taken under advisement.